STATE

v.

Chantha LEUTHAVONE.

No. 93–7–C.A.

Supreme Court of Rhode Island.

April 14, 1994.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., Aaron Weisman, Chief, Appellate Div., for plaintiff.

Richard Casparian, Public Defender, Janice Weisfeld and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Chantha Leuthavone (defendant) from a judgment of conviction of first-degree murder, two counts of assault with a dangerous weapon, and illegal possession of a firearm. The primary issue on appeal is whether the defendant's statement to the Providence police should have been admitted into evidence. After considering the defendant's arguments, we deny his appeal and affirm the judgment of the Superior Court. A summary of the facts follows.

## I

### FACTS AND PROCEDURAL HISTORY

At approximately 9:45 p.m. on March 2, 1990, about twelve adults, including defendant, attended a going-away party in a second-floor apartment at 29 Moy Street in Providence, Rhode Island (Moy Street party). After consuming two alcoholic beverages, defendant apparently decided that it would be unwise to continue drinking on an empty stomach. It was at this point that a guest, Sonexay Phommachanh (Phommachanh), offered defendant a third drink. The defendant refused the drink, causing Phommachanh to call him "chicken." This angered defendant, and a confrontation ensued.

Phommachanh allegedly proclaimed himself the "toughest guy in Boston," whereupon defendant apparently warned that, because he (defendant) was a "big shot," anybody who confronted him would "not * * * leave town." Nonetheless a fight was avoided, and defendant and guest Lamphone Vorgvongsa (Vorgvongsa) left the party together. Upset and hoping to avoid trouble, the remaining party goers decided to relocate. As they left the apartment, went downstairs and prepared to depart, defendant's silver Toyota Supra (Supra) suddenly appeared.

The car had three occupants: defendant, Vorgvongsa, and Phommachanh Daranikone (Daranikone). Although conflicting testimony was presented at trial, it appears that after leaving the Moy Street party, defendant and Vorgvongsa drove to Vorgvongsa's house where Vorgvongsa took possession of a gun. They then drove to pick up Daranikone at 20 Inkerman Street where defendant smuggled a gun from Daranikone's bedroom. The trio returned to the Moy Street party.

Upon arriving, they alighted from the Supra and encountered the other party goers. The defendant apologized to the group, whose members then decided to reconvene the party. There were no indications that defendant and Vorgvongsa were angry. Unbeknownst to the other guests, however, Vorgvongsa and defendant had armed themselves, defendant, in particular, with a handgun owned by his friend Daranikone.

After returning to the second-floor apartment, defendant and Vorgvongsa—who remained by each other's side—entered the kitchen while the other guests gathered in the living room and tried to regain their partying spirit. At some point Phommachanh walked toward the kitchen, apparently in an effort to apologize to defendant. Suddenly, defendant sprang from the kitchen and pushed Phommachanh back into the living room. The defendant then pulled a handgun out of his jacket, and Vorgvongsa, who had followed defendant from the kitchen, drew a gun from the area of his ankle. Pointing at the party goers, defendant and Vorgvongsa each pulled the trigger of his gun. When defendant pulled his trigger, his gun was aimed directly at Phommachanh.

Fortunately, the guns did not fire, though the party goers scrambled for cover. The defendant removed the bullets from his gun and reloaded it. By this time, Phommachanh had run out the back door of the apartment and toward the street below. Screaming, "Let's get him," defendant and Vorgvongsa immediately pursued him through the back door and down the back steps of the apartment building. The trio disappeared from the other party goers' view. Suddenly, three gunshots were heard.

The police were summoned. About two houses down the street from the apartment's back steps, Phommachanh, still alive, was discovered. He later died of a single gunshot wound to the back.

Less than two hours later, Sergeant Timothy Patterson of the Providence police department spotted defendant's parked Supra. He immediately summoned another police officer and placed the automobile under surveillance. About twenty minutes later, defendant and Daranikone left Vorgvongsa's house and climbed into the Supra. As they began to drive away, the police blockaded the Supra and, with guns drawn, approached the vehicle and ordered its occupants to raise their hands. The defendant, sitting on the passenger's side, bent over and placed his hands in the floor area of the car before both suspects were taken into custody. A gun and a pair of ski gloves were later discovered under defendant's car seat.

Both defendant and Daranikone were jailed in Providence, and later—with the assistance of Officer Bounhevang Khamsyvoravong (Khamsyvoravong)—each issued a statement to the Providence police department. On August 29, 1990, indictment No. P1/90–2966B was filed, and it charged, *inter alia*, that defendant and Vorgvongsa, on March 2, 1990, had murdered Phommachanh in violation of G.L.1956 (1981 Reenactment) § 11–23–1. A jury trial was held in Superior Court, and on July 10, 1992, defendant was found guilty of murder in the first degree, two counts of assault with a dangerous weapon, and illegal possession of a firearm. On September 23, 1992, defendant was given a mandatory life sentence on the conviction of

murder in the first degree. In response, defendant, on September 23, 1992, filed the instant appeal pursuant to G.L.1956 (1985 Reenactment) § 9–24–32.

## II

### MOTION TO SUPPRESS

The defendant's first contention on appeal was that, given the totality of the circumstances, his March 3, 1990 statement to the Providence police should have been suppressed. We disagree.

"In reviewing a trial justice's decision on a motion to suppress, this court views the evidence in the light most favorable to the state and applies the 'clearly erroneous' rule." *State v. Marini*, 638 A.2d 507, 513 (R.I.1994). A trial justice's findings of fact, therefore, "will not be disturbed unless the trial justice misconceived or overlooked material evidence or was 'clearly wrong.' " *Id.*

On October 24, 1990, defendant moved to suppress his statement to the Providence police on the grounds that it was made involuntarily and without the benefit of an effective *Miranda* warning. After conducting an independent hearing on defendant's motion, the trial justice determined that the state had proven compliance with *Miranda* and had proven voluntariness by clear and convincing evidence. *State v. Espinosa*, 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971). The justice therefore denied the motion and allowed the statement into evidence.

In support of his contention that the statement should have been suppressed, defendant on appeal made the following allegations: (1) the state failed to show that Khamsyvoravong did not make coercive statements to defendant or present himself as defendant's ally and countryman; (2) the state failed to present testimony that defendant had not been "previously interrogated"; (3) the state failed to establish that defendant had not been deprived of food, drink, or sleep; (4) the trial justice failed to duly consider the eighteen hours that police held defendant in custody; and (5) the trial justice failed to properly consider the impact of defendant's status as a foreigner who spoke little English and was unfamiliar with our legal system. We now examine each of these contentions.

### A

### VOLUNTARINESS

Statements are voluntary when they are " 'the product of [a] free and rational choice.' " *State v. Amado*, 424 A.2d 1057, 1062 (R.I.1981). But, as this court noted in *State v. Pacheco*, 481 A.2d 1009, 1025 (R.I. 1984), the literal application of the rule enunciated in *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897), holding that a confession must be free and not extracted by any direct or implied promise, was probably rendered unnecessary by the prophylactic requirements of *Miranda*. Consequently, a statement is not rendered involuntary by factors such as promises or positive reactions by police. *Pacheco*, 481 A.2d at 1026–27. Rather, "all facts and circumstances surrounding the [statement] must be taken into account in determining whether, overall, [it] was freely and voluntarily made." *Marini*, 638 A.2d at 512. *Accord Withrow v. Williams*, —— U.S. ——, ——, 113 S.Ct. 1745, 1751, 123 L.Ed.2d 407, 417 (1993).

After reviewing the record of the suppression hearing, we are of the opinion that the trial justice properly concluded that defendant's statement was voluntarily given. There is no evidence that defendant was mistreated or unduly pressured or coerced into making statements to the Providence police. Indeed, the only witness to testify at the hearing—Officer Khamsyvoravong—stated that neither he nor anybody else threatened defendant in any way or promised him anything in return for a statement. He also opined that defendant appeared to be normal, intelligent, and free of the influence of drugs and alcohol. When asked whether he had told defendant that cooperation would make everything "all right," Khamsyvoravong responded, "No," but he could not recall whether he had tried to make defendant feel comfortable at the police station. The defendant, however, produced no direct evidence

at the hearing to show that Khamsyvoravong had manipulated him in any way.

Although Khamsyvoravong was unsure how long defendant had been at the station and whether defendant had eaten, drunk, or slept during his stay, defendant himself presented no direct evidence at the hearing to establish the duration of his detention or of any deprivation of food, drink, or sleep. Furthermore, no evidence was presented at the hearing to establish that defendant was interrogated more than once on March 3, 1990.

Although evidence of the conditions during custody would have been relevant in determining whether defendant's statements were voluntary, such evidence would not necessarily have been dispositive. In any case the state had no burden to produce such evidence. *See United States v. Montgomery,* 14 F.3d 1189 (7th Cir.1994). The trial justice believed Khamsyvoravong's testimony, and the substance of that testimony alone was more than sufficient to establish the voluntariness of defendant's March 3 statement by the requisite clear and convincing evidence. *See State v. Griffith,* 612 A.2d 21, 25 (R.I. 1992). Buttressing this conclusion is our determination that defendant's statement was made in full compliance with *Miranda.*

### B

#### COMPLIANCE WITH *MIRANDA*

■ "A voluntary, knowing, and intelligent waiver of *Miranda* rights must be shown by the state before comments made by a defendant during *custodial interrogation* can be admitted into evidence." *Marini,* 638 A.2d at 511. Judicial inquiry into the propriety of a defendant's waiver, therefore, is two dimensional. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986). "First, the relinquishment of the right must have been voluntary * * *. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In determining whether an accused waived his *Miranda* rights, we are required by the Supreme Court to inquire into the

"totality of the circumstances surrounding the interrogation." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197, 212 (1979); *Amado,* 424 A.2d at 1061.

### 1
#### WAIVER WAS VOLUNTARY

■ A review of the record of the suppression hearing disclosed that the trial justice properly concluded that defendant had voluntarily, knowingly, and intelligently waived his *Miranda* rights. As discussed *supra,* the record of the hearing contained no evidence that defendant was coerced into giving the police a statement. "Absent evidence that [defendant's] 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct * * * his waiver * * * was voluntary under * * * *Miranda.*" *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 966 (1987).

### 2
#### WAIVER WAS KNOWING AND INTELLIGENT

■ We have concluded that the waiver was voluntary, but was the waiver knowing and intelligent? Khamsyvoravong, who fluently spoke and read both English and Laotian, testified at the suppression hearing that he had the opportunity to converse with defendant for approximately ten minutes prior to advising defendant of his *Miranda* rights. He and defendant experienced no difficulty communicating with each other during this time. Subsequently Detective William McGurn (McGurn) read defendant his *Miranda* rights in English.

After each *Miranda* right had been read in English, Khamsyvoravong translated the right into Laotian for defendant, and Khamsyvoravong then asked defendant whether he understood the right. In regard to each *Miranda* warning, defendant responded, "Yes," to Khamsyvoravong's question. Khamsyvoravong opined that defendant, who spoke limited English, understood the Laotian translation. Indeed, defendant asked no questions about his *Miranda* rights and pro-

ceeded to give the police a statement. The statement was typewritten by McGurn, and Khamsyvoravong repeatedly reread the typewritten statement back to defendant in Laotian. The defendant then signed the written statement without altering it.

■ If a suspect has been advised of *Miranda* rights and thereby comprehends that there is a right to counsel and a right to remain silent *and* that any statements made may be used against the suspect in subsequent criminal proceedings, the suspect—for purposes of the Constitution—has been made fully aware of the nature of his or her rights and the possible consequences of abandoning those rights. In such a case any subsequent waiver of those rights would be found to be knowing and intelligent. *See Patterson v. Illinois,* 487 U.S. 285, 293–94, 108 S.Ct. 2389, 2395–96, 101 L.Ed.2d 261, 273 (1988); *Spring,* 479 U.S. at 574, 107 S.Ct. at 857–58, 93 L.Ed.2d at 966; *United States v. Yunis,* 859 F.2d 953, 964–65 (D.C.Cir.1988). If, after being apprised of the *Miranda* warnings, a suspect "nonetheless lack[s] 'a full and complete appreciation of all * * * the consequences flowing' from [a] waiver, it does not defeat [a] showing that the information * * * provided to him satisfied the constitutional minimum." *Patterson,* 487 U.S. at 294, 108 S.Ct. at 2396, 101 L.Ed.2d at 273. *Accord Spring,* 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 966.

■ Thus although, as defendant contended, a foreigner's unfamiliarity with our system of justice may result in a failure to appreciate the tactical advantages of not responding and of procuring counsel, *see Yunis,* 859 F.2d at 965, the significance of such unfamiliarity is limited to its impact on the suspect's *ability to comprehend* the *Miranda* warnings, *see id.*

■ Furthermore, a foreigner's inability to speak English does not necessarily preclude an effective waiver of *Miranda* rights. "Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." *United*

States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir.1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). *Accord United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987); *United States v. Gonzales,* 749 F.2d 1329, 1336 (9th Cir.1984).

Application of these principles to the circumstances of the instant case inescapably leads to the conclusion that defendant's waiver was both knowing and intelligent even if, as defendant contended, he could not speak fluent English and did not understand the full consequences of making a statement to the police. Indeed, to hold otherwise would permit defendant and others similarly situated to remain willfully ignorant of the English language and thereby largely avoid the ramifications of self-incrimination during custodial interrogation. Such a result would be undesirable, *cf. United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 245 (1977) ("admissions of guilt * * * are inherently desirable"), for admissions of guilt "are essential to society's compelling interest in finding, convicting, and punishing those who violate the law," *Moran,* 475 U.S. at 426, 106 S.Ct. at 1143, 89 L.Ed.2d at 424.

Our conclusion that defendant fully comprehended his *Miranda* rights is not altered by defendant's suggestion that the Providence police should have recognized defendant's unique cultural background and inexperience with our legal system, and should have disregarded defendant's affirmations of comprehension and offered explanations for such terms as "court of law" and "lawyer."

Although the additional explanations may have affected defendant's decision to issue a statement, *see Moran,* 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421, imposition of such an added burden on law-enforcement authorities "is neither practicable nor constitutionally necessary," *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222, 236 (1985). As written, *Miranda* does not require the police to provide suspects with a précis of criminal law prior to soliciting statements from them. The Supreme Court has declined to extend the requirements of *Miranda* because to do so could impair its clarity and ease of applica-

tion, *Moran*, 475 U.S. at 425, 106 S.Ct. at 1143, 89 L.Ed.2d at 423, as well as subvert its careful balance between the interests of society and those of the individual. The Supreme Court has warned that the practice of "'forever adding new stories to the temple'" of a well-settled rule can only hasten the collapse of the entire temple "'when one story too many is added.'" *McNeil v. Wisconsin*, 501 U.S. 171, 182, 111 S.Ct. 2204, 2211, 115 L.Ed.2d 158, 171 (1991). We as well decline to augment the scope of *Miranda*, wary that our tampering may unsettle the delicately balanced principles that have evolved. Accordingly, we affirm the trial justice's denial of defendant's motion to suppress his confession.

### III

### THE JURY INSTRUCTIONS

■ The defendant on appeal challenged the sufficiency of the trial justice's instructions concerning the *mens rea* necessary for conviction as an aider and abettor. The defendant argued that the instructions failed to specify that an aider and abettor "must share the same malicious intent as the [principal]." We conclude that the trial justice correctly instructed the jury.

■ A jury charge is required to cover the law adequately. *State v. Grundy*, 582 A.2d 1166, 1170 (R.I.1990). On appeal, this court examines jury instructions in their entirety to determine the manner in which a jury of ordinary, intelligent lay persons would have comprehended them. *State v. Gomes*, 604 A.2d 1249, 1256 (R.I.1992). "To ascertain whether an instruction has fairly set forth * * * the [controlling] legal principles * * * we must read the allegedly inadequate instructions in the context of the charge as a whole." *State v. Baker*, 417 A.2d 906, 910 (R.I.1980).

In addition to his final charge to the jury, the trial justice preliminarily instructed the jury on the crime of aiding and abetting.[1] In the final charge, he instructed the jury, in relevant part, as follows:

"Mere presence at the scene of the crime or mere knowledge that a crime is being committed is not sufficient to establish that the defendant aided and abetted the crime unless you find beyond a reasonable doubt that *the defendant shared in the criminal intent* and was a participant in the crime. In other words, you must find beyond a reasonable doubt that there was a community of unlawful purpose at the time the act was committed; that the defendant was a knowing, willing, active participant in that community in some way. In order to aid and abet * * * it is necessary that the defendant willfully associated himself * * * with the criminal venture and willfully participated in it *as he would in something he wishes to bring about*." (Emphasis added.)

■ In addition to presence at the scene of the crime, which is a factor that must be considered, "[o]ur criminal act of aiding and abetting requires two elements; first, that the alleged aider and abettor share in the criminal intent of the principal, and second, that there exist a community of unlawful purpose." *Curtin v. Lataille*, 527 A.2d 1130, 1132 (R.I.1987).

Clearly the instruction at issue adequately covered the law of aiding and abetting. Indeed, it was virtually identical to those aiding and abetting charges that we have affirmed in the past. *See State v. Medeiros*, 599 A.2d 723, 726 (R.I.1991); *State v. Eddy*, 519 A.2d 1137, 1143 (R.I.1987). However, unlike the instructions in *Medeiros* and *Eddy*, which expressly required the jury to find that the defendant shared in the *criminal intent of the principal*, the instruction in this case omitted reference to the "intent of the principal" and referred only to the "criminal intent."

■ We are of the opinion that this minor disparity does not affect the propriety of the instruction. It is well established that "[t]he trial justice is free to instruct the jury in his own words in a criminal proceeding, as long as he or she states the applicable law." *State v. Ahmadjian*, 438 A.2d 1070, 1086 (R.I.1981). Before giving the final instruc-

---

1. The preliminary and the final instructions on   aiding and abetting were virtually identical.

tion on aiding and abetting, the trial justice instructed the jury on the charge of murder, including the element of intent. Then, following the aiding and abetting instruction, the trial justice explained the element of intent.

Having viewed the charge as a whole, we conclude that it properly outlined the elements of the law of aiding and abetting. Moreover, the charge to a jury of ordinary, intelligent lay persons adequately directed them to find that defendant shared in the principal's criminal intent to commit the murder of Phommachanh as a prerequisite to their finding defendant guilty of aiding and abetting the murder. "No more can or should be required of a trial justice." *State v. Manning*, 447 A.2d 393, 394 (R.I.1982).

## IV

## MOTION FOR JUDGMENT OF ACQUITTAL

 The defendant lastly contended that the trial justice erred in denying his motion and renewed motion for judgment of acquittal on the ground that there was insufficient evidence to prove beyond a reasonable doubt that defendant shared Vorgvongsa's intent to murder Phommachanh. The defendant relied upon *State v. Gazerro*, 420 A.2d 816, 828–29 (R.I.1980), and the cases cited therein.

 "In ruling on a motion for a judgment of acquittal, the trial justice must 'weigh the evidence in the light most favorable to the state, draw from such evidence all reasonable inferences that are consistent with the guilt of the accused and give full credibility to the state's evidence.'" *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992). On appeal, we employ this same standard in reviewing the trial court's ruling on a motion for judgment of acquittal. *State v. Goodreau*, 560 A.2d 318, 322 (R.I.1989).

After carefully reviewing the record before this court and after considering defendant's arguments, we conclude that the trial justice properly denied the defendant's motion and renewed motion for judgment of acquittal. When viewed in a light most favorable to the state, the direct evidence in this case together with the reasonable inferences drawn therefrom—unlike the evidence in *Gazerro*—establish that the defendant and Vorgvongsa prearranged the murder, that the defendant was present at the scene of the murder, and that the defendant participated affirmatively in the commission of the crime. This evidence was therefore sufficient to prove beyond a reasonable doubt that the defendant aided and abetted Vorgvongsa in murdering Phommachanh. *See State v. Hart*, 106 R.I. 213, 215–17, 258 A.2d 70, 72 (1969) (involving circumstantial inferences which supported finding that the defendant knew of, and participated in, crime of breaking and entering). *Cf. Gazerro*, 420 A.2d at 829 (where evidence failed to establish that the defendant knew of impending criminal activity and participated in it, state did not prove the defendant had aided and abetted the crime).

Accordingly, the defendant's appeal is denied and dismissed, and the judgment of the Superior Court is affirmed.