STATE

v.

Carlos JIMENEZ.

No. 2009–336–C.A.

Supreme Court of Rhode Island.

Dec. 14, 2011.

Virginia M. McGinn, Department of Attorney General, for State.

Paula Rosin, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, Carlos Jimenez, appeals from a judgment of conviction on two counts of first-degree sexual assault. The defendant had been accused by his sister-in-law, Mary,[1] of sexually assaulting her while she was too intoxicated to resist. The defendant raises three issues on appeal. First, the defendant argues that the trial justice erred in denying his motion to suppress the oral and written statements he made to the police. Second, the defendant asserts that the trial justice should have granted his motion for judgment of acquittal on the count alleging vaginal/penile penetration. Third, the defendant maintains that the trial justice erred in denying his motion for a new trial.

This case came before the Supreme Court pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

On February 29, 2008, a grand jury indicted defendant on two counts of first-degree sexual assault. Count 1 charged defendant with vaginal/penile penetration with Mary while knowing or having reason to believe she was physically helpless, and count 2 charged defendant with cunnilingus with Mary while knowing or having reason to believe she was physically helpless. Before trial, defendant moved to suppress all the oral and written statements he had made to police officers. The motion was denied, and a jury trial commenced on May 28, 2009. The pertinent evidence adduced at defendant's trial is as follows.

On July 14, 2007, defendant and his wife held a party at their home. Mary testified that she "got drunk" after consuming approximately one glass of wine and six or more shots of tequila. The defendant's wife, Ana Jimenez, testified that she believed Mary had consumed "one too many" and asked Mary to stop drinking because she was acting inappropriately. This "inappropriate" behavior included dancing and flirting with various men at the gathering, including defendant. Mary testified she had no memory of dancing or flirting at any point at the party; however, she admitted she is unable to remember parts of the evening.

Mary exhibited the extent of her intoxication later in the evening when she fell in the kitchen, resulting in her splitting her lip and chipping her tooth. By this point Mary was unable to stand on her own, so Mrs. Jimenez helped her downstairs to the basement to let her sleep on a couch. Mrs. Jimenez testified it was difficult to situate Mary "because she just plopped" on the couch and "was just moving * * * all over the place, making it difficult * * * to adjust her." After getting Mary situated, Mrs. Jimenez placed Mary's two-and-a-half-year-old daughter on the couch with Mary. Mrs. Jimenez said that she took Mary's sandals off her feet, but left her fully clothed, wearing a green shirt and

1. The name of the complaining witness is fictitious to protect her privacy.

jean shorts; she did not cover Mary with a blanket because it was a hot July night.

Mary testified that after falling in the kitchen, her next memory was lying on the couch in the basement unaware of how she got there. She described herself as lying on the couch feeling "helpless" and "all weak." She also testified that the next thing she remembered was defendant coming downstairs. Specifically, she stated: "I remember him kneeling on the floor, and * * * shifting my legs toward the side of him, and I remember him raping me while my daughter was crying." Mary attested that defendant took her shorts off, but she was not sure whether her panties also were pulled off at the same time, and that then he moved her legs toward the floor, where he was kneeling. She remembered defendant then placing his penis inside of her.[2] When asked what she was doing during this time she testified that she was "just helpless" and "couldn't move" because she was "so drunk." Mary said she had no memory of what happened immediately after the intercourse. Mary testified that she woke up the next morning without her shorts on and "remembered what happened."

The defendant testified, through an interpreter, in his own defense and told a markedly different account of what occurred in the basement on the night of July 14, 2007. He said that at one point in the evening he went to the basement "to get some music." He testified that after grabbing a few CDs, he heard someone ask who was there. He answered and, upon moving closer, realized it was Mary.[3] He asked her what it was that she wanted and, according to defendant, Mary responded by grabbing his hand and sliding it toward "her intimate parts." Construing Mary's action as "an invitation," defendant pulled down her shorts and panties and kissed her "on top" of her "intimate part." According to defendant, he then stopped because he realized he was doing something that was "not correct" and did not want Mary or himself to be in trouble with his wife. He testified that at this time he stood up, pulled up her panties, and covered her with a blanket. He stated he did not put her shorts back on because Mary told him "no" and to "go upstairs." The defendant further testified that Mary never told him to stop or tried to push him away, and that he never took his shorts off or put his penis into Mary's vagina.

On July 16, 2007, Mary went to her mother's apartment between 8 and 8:30 a.m. Mary testified that she started to cry and then told her mother that defendant had raped her. Her mother "went ballistic," called Mrs. Jimenez, and requested that Mrs. Jimenez and defendant come to her apartment immediately.

As soon as Mrs. Jimenez and defendant arrived, defendant's mother-in-law "punched" him several times and Mary accused him of raping her. According to Mrs. Jimenez, Mary was "yelling out of the top of her lungs" for defendant to be hon-

---

**2.** Mary's initial testimony was that "[h]e just took his penis out and ejaculated into my vagina." After further questioning on direct examination, however, Mary explained that what she meant by this statement was "he went inside of me" and that she did not know whether he ejaculated inside of her or not. On cross-examination, Mary indicated she was confused over the terms ejaculation and insertion when testifying on direct examination.

**3.** The defendant testified on direct examination that he was not aware of where Mrs. Jimenez had taken Mary after her fall. However, upon cross-examination, he admitted he had known that Mrs. Jimenez brought Mary to the basement, but he said he was nonetheless "surprised" to see her sleeping on the couch.

est, and she said that she knew "he did it." Mrs. Jimenez continued to testify that defendant initially denied Mary's allegations, but after "a couple times of asking, he admitted that he had taken off her shorts." Whereupon, Mary immediately called the police.

Officer Salvador Sanchez of the Cranston Police Department testified to having received a call from dispatch for "a possible sexual assault which had turned into a disturbance." Officer Sanchez was accompanied by Officer Robert Santagata when he arrived at the purported disturbance. Officer Sanchez testified that upon entering the bedroom area of the apartment, Mary "immediately yelled and pointed to [defendant] * * *, yelling that he had raped [her]." At that point, Officer Sanchez escorted defendant to the living room to speak with him alone and to give Mary an opportunity to speak with Officer Santagata.

In the living room, according to Officer Sanchez, defendant was "quiet [and] calm," but was pale and looked as if he had been crying. Officer Sanchez, in English, asked defendant "what had transpired" and defendant responded, with his eyes focused on the floor, that "he didn't do anything." Officer Sanchez continued to question defendant about what happened and several times defendant repeated he had not done anything. Mrs. Jimenez then entered the room and yelled at defendant in Spanish to tell Officer Sanchez "what he had confessed to them." Officer Sanchez understood

what Mrs. Jimenez was yelling because Spanish is his "primary language."

After Mrs. Jimenez confronted defendant, defendant informed Officer Sanchez that he went down to the basement to retrieve some CDs and had pulled down Mary's shorts, but he "had not done anything to her and walked out of the basement feeling guilty." Officer Sanchez testified that he then asked defendant whether he had touched Mary, and that defendant "nodded his head saying yes" in response. Officer Sanchez asked defendant what he meant by nodding his head and defendant responded that "he had not done anything wrong." At this point, according to Officer Sanchez's testimony, Sergeant Alan Loiselle[4] instructed Officer Sanchez to suspend questioning of defendant and take him into custody. Officer Sanchez then handcuffed defendant and took him to police headquarters. The defendant was fingerprinted, photographed, and then placed in a cell "to await the arrival of detectives." Officer Sanchez testified that up until that point defendant had not been informed of his rights.

The defendant later was brought into an interview room adjacent to the cellblock.[5] Present in the interview room with defendant were Officer Sanchez, Detectives Peter Podedworny and Craig Pieranunzi.[6] Officer Sanchez was dressed in uniform and Det. Podedworny in plain clothes. No firearms were present in the interview room, and defendant was not handcuffed. Officer Sanchez read defendant his rights

---

**4.** Sergeant Loiselle arrived on the scene at some point after Officers Sanchez and Santagata.

**5.** At the suppression hearing, Detective Peter Podedworny testified that the interview room employed by the detectives for defendant's questioning was not the one normally used for such interviews. The room was described

as "institutional looking" with metal tables and chairs.

**6.** The trial transcript continually spells Det. Pieranunzi's name as "Peranunzi"; however, Det. Pieranunzi's name is spelled "Pieranunzi" in his police report. Accordingly, that is the spelling this Court will adopt.

in Spanish.[7] The defendant also read each right out loud. After each right was read, Officer Sanchez asked defendant whether he understood that right, and if he stated that he did, defendant was to indicate as much by marking his initials. Officer Sanchez testified that defendant answered "yes" when asked after each right if he understood what he was reading. The defendant initialed each right and signed the form stating he understood his rights and that the police had not made any promises or threats. After the rights were administered, defendant was asked whether he would be willing to speak with the detectives, and he responded that "he would cooperate and speak with them." Officer Sanchez and Det. Podedworny testified that defendant stated "he would be fine" speaking in English and that defendant was informed that, if he had any difficulty understanding the language, Officer Sanchez was there to offer clarification or translation in Spanish.

Detective Podedworny testified that he and Det. Pieranunzi both participated in questioning defendant for approximately one hour. Detective Podedworny testified that the interview was "routine question-ing" and that there was no yelling and no threats or promises made to defendant. Further, according to Det. Podedworny and Officer Sanchez, defendant never asked for the interview to be stopped and never requested an attorney.

At the conclusion of the interview, defendant was asked to memorialize his oral statement in writing. Detective Podedworny testified that defendant indicated he would comply and asked if he could do so in Spanish. According to Officer Sanchez, defendant was told to write down what he had verbally told the detectives. The defendant's written, signed statement says as follows in English translation:

"On Saturday July 14 I was at a family party at my house[. W]e were all drinking beer and tequila[. M]y sister-in-law [Mary] fell in the kitchen and I picked her up[. M]y wife brought her down to the basement[. M]y sister-in-law fell asleep[.] I pulled down her panties and shorts[.] I kissed her on the vagina on top with my tongue[. M]y sister-in-law was on the couch and I got on my knees in front of her[.] I pulled down her panties a little[. A]t no time did I penetrate her[.]"[8]

---

7. The Spanish Rights Form reads as follows in English translation:

"I, *Carlos Jimenez*, am aware that I am a suspect in the crime of *Sexual Assault*. Before we ask you any questions, You (formal speech) should be aware of your rights.

"*CJ* 1. I have the right to remain silent. I am not obligated to make any statement.

"*CJ* 2. Anything I say can be used against me in court.

"*CJ* 3. I have the right to be represented by a lawyer before and during any police interrogation.

"*CJ* 4. If I cannot afford a lawyer, one will be appointed to me before any interrogation if I choose to.

"*CJ* 5. If I talk to the police I can stop the answers at any time.

The police have not made any promises or threats.

I understand my rights. Yes CJ No ___
Carlos Jimenez
Signature[.]"

The defendant's form was written in Spanish originally, but was translated by a court-appointed translator and admitted into evidence as Exhibit 8A. That translation is transcribed above. The defendant inserted his name, address, initials, and signature. It should also be noted that the only language transcribed above not initially in Spanish were the words "Sexual Assault." Further, Officer Sanchez testified at the suppression hearing that he was unsure whether defendant inserted the words "Sexual Assault."

8. The defendant's original statement was written in Spanish. Officer Sanchez initially translated defendant's statement into English. However, the trial justice ordered that a court-certified interpreter translate defen-

After the state rested, defendant moved for judgment of acquittal, which motion the trial justice denied. On June 2, 2009, a jury found defendant guilty on both counts of first-degree sexual assault. On June 16, 2009, a hearing was held on defendant's motion for a new trial. At that hearing, defendant argued that a reasonable person should not have believed Mary's testimony because the "actions she took made no sense for someone who was supposedly or allegedly assaulted by an individual." After reviewing all the evidence, the trial justice concluded that the state had met its burden of proving guilt beyond a reasonable doubt on both counts.[9] Accordingly, the trial justice ruled there was sufficient evidence to justify the jury's verdict, and she denied defendant's motion for a new trial.

The trial justice sentenced defendant to twenty-five years at the Adult Correctional Institutions, nine years to serve and sixteen years suspended, with probation as to count 1. The same sentence was ordered as to count 2, to run concurrently with count 1. The defendant filed notices of appeal on September 8, 2009 and on September 29, 2009. The judgment of conviction and commitment was entered on October 5, 2009.[10]

## II

## Discussion

### A

### Motion to Suppress

On appeal, defendant first argues that the trial justice erred in denying defen- dant's motion to suppress his oral and written statements made to law enforcement officers. The defendant's argument is two-fold. First, defendant contends that the statement he made at his mother-in-law's apartment should have been suppressed because they were the product of custodial interrogation and defendant was not informed of his *Miranda* rights. Specifically, defendant asserts he was in custody at his mother-in-law's apartment on July 16, 2007, as soon as Officer Sanchez escorted him into a separate room. The defendant maintains that the "stressful and hostile" environment, the nature of the accusations alleged, the manner in which defendant was confronted with such allegations, and the fact that a uniformed officer questioned him separately for up to forty-five minutes without informing him he had the option to refuse to comply, when viewed in totality, demonstrate that defendant was under police custody and "not free to leave."

Second, defendant argues that the statements he made at the police station should have been suppressed "because the prosecution failed to meet its burden of proving by clear and convincing evidence that [defendant] knowingly and intelligently waived his *Miranda* rights and voluntarily made statements to the police." To support this argument, defendant points to his own testimony at the suppression hearing. There, through an interpreter, defendant testified that he does not read or write English, but can read and write Spanish.

---

dant's statement into English. This translation, marked as Exhibit 9A and entered into evidence, is reproduced above.

9. The trial justice even indicated that as to count 1 she "would have found the defendant guilty beyond a shadow of a doubt, * * * a harsher standard than beyond a reasonable doubt."

10. "Although defendant's notices of appeal were filed before the entry of judgment, 'this Court treats [them] as if [they] had been filed after the entry of judgment.' " *State v. Vargas,* 21 A.3d 347, 352 n. 9 (R.I.2011) (quoting *State v. Hesford,* 900 A.2d 1194, 1197 n. 3 (R.I.2006)).

Further, defendant attests that although he signed the Spanish Rights Form, "he did not understand his rights because he was confused and afraid, and felt pressured because of the events at his mother-in-law's home, and * * * had never been arrested before." The defendant contends he knew Officer Sanchez spoke Spanish, but was not aware Officer Sanchez was there to help him translate or that he could speak with Officer Sanchez in Spanish. The defendant also asserts he submitted a written statement to police only because he was told he had to give a statement "because the judge needed one."

### 1. Standard of Review

■ "In reviewing the trial justice's denial of defendant's motion to suppress * * * incriminating * * * [statements], we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." *State v. Linde*, 876 A.2d 1115, 1124 (R.I.2005) (quoting *State v. Apalakis*, 797 A.2d 440, 443 (R.I.2002)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review * * *." *Linde*, 876 A.2d at 1124 (quoting *Apalakis*, 797 A.2d at 443). Specifically, "[w]hether defendant's detention constituted an 'unreasonable seizure' and whether defendant's statements to police were 'voluntary' are both questions that this Court reviews *de novo*." *Apalakis*, 797 A.2d at 443.

### 2. Custodial Interrogation

■ It is well settled that the requirement of *Miranda* warnings is triggered only by custodial interrogation. *State v. Hobson*, 648 A.2d 1369, 1371 (R.I.1994). "By its own terms the rule applies only when interrogation occurs within the coercive atmosphere of police custody." *Id.* (quoting *State v. Caruolo*, 524 A.2d 575, 579 (R.I.1987)). "The invocation of *Miranda*, therefore, generally hinges entirely upon whether, at the time of his confession, the accused was [in custody]." *State v. Marini*, 638 A.2d 507, 511 (R.I.1994).

■ "It is a fundamental principle that '[a] person is seized or under arrest for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave.'" *State v. Vieira*, 913 A.2d 1015, 1020 (R.I.2007) (quoting *State v. Diaz*, 654 A.2d 1195, 1204 (R.I.1995)). This Court has stated that the following four factors may be considered in making this determination: "(1) the extent to which the person's freedom [was] curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Id.; see also State v. Briggs*, 756 A.2d 731, 737 (R.I.2000).

Applying these principles to the present case, we are satisfied that the trial justice correctly determined that defendant was not in custody until such time as Sgt. Loiselle ordered defendant to be handcuffed and taken to the police station; consequently, he was not entitled to *Miranda* warnings before that time. There is no evidence suggesting that defendant's freedom of movement was curtailed at any time, nor that the police employed any force or coercion such that a reasonable person under the circumstances would believe that he was not free to leave.

Officers Sanchez and Santagata were voluntarily admitted into the apartment. There, to use the trial justice's words, the officers were confronted by a "pretty hysterical scene," so Officer Sanchez escorted defendant to the living room to give Mary an opportunity to speak with Officer Santagata. It is at this very point that defendant claims he was in police custody.

However, at that instant, no formal procedures were initiated indicating that defendant was under arrest or that his freedom was in any way restricted. *See Hobson,* 648 A.2d at 1372 (holding the defendant was not in custody when he was advised he was not under arrest, voluntarily went to the police station, was invited to give his side of the story, and was not placed under any restraints). This "noncustodial atmosphere was not converted into a custodial one simply because * * * defendant may have been a suspect" or because law enforcement was present. *Marini,* 638 A.2d at 511; *see also Diaz,* 654 A.2d at 1205.

The defendant agreed to accompany Officer Sanchez into the living room and spoke calmly to Officer Sanchez, voluntarily answering his questions without Officer Sanchez raising his voice or exerting any force over defendant. In fact, it was the plea of defendant's wife, not Officer Sanchez, that ultimately moved defendant to admit that he had removed Mary's shorts. Considering the totality of the circumstances, the setting under which defendant was interrogated[11] did not give rise to the requisite "police dominated" coercive atmosphere against which *Miranda* was designed to protect. *See Maryland v. Shatzer,* ⸺ U.S. ⸺, ⸺, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010) (stating that *Miranda*'s safeguards are to protect against the "inherently compelling pressures" of custodial interrogation in a "police-dominated atmosphere") (quoting *Miranda v. Arizona,* 384 U.S. 436, 456, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

Further, the fact that defendant was not informed by Officer Sanchez that he was free to leave does not change our determination that defendant was not in custody. *See State v. Girard,* 799 A.2d 238, 248 (R.I.2002); *see also State v. Kryla,* 742 A.2d 1178, 1182 (R.I.1999) ("Our conclusion that no seizure occurred is not affected by the fact that [the defendant] was not expressly told by the [officers] that [he] was free to decline to cooperate with their inquiry, for the voluntariness of [his] responses does not depend upon [his] having been so informed.") (quoting *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Overall, despite defendant's attested subjective belief that he was not free to leave, there is no evidence in the record suggesting that Officer Sanchez's conduct, demeanor, or questioning would cause a reasonable person in defendant's situation to believe he was not free to leave. We, therefore, hold that defendant was not in custody at his mother-in-law's apartment at the time he gave a statement to Officer Sanchez. Accordingly, the trial justice correctly denied defendant's motion to suppress such statement.

### 3. Voluntary, Knowing, and Intelligent Waiver

▉ The defendant also challenges the admission of the statements he made while in custody at the Cranston police station. Before a trial justice can admit a confession or a statement elicited during custodial interrogation, the state must "first prove by clear and convincing evi-

---

11. The state does not refute the fact that defendant was interrogated. Interrogation is defined as "express questioning" or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64

L.Ed.2d 297 (1980). Here, Officer Sanchez testified that he "kept asking" defendant questions such as "are you sure you didn't do anything, or nothing's going on?" and followed up with such questions as whether defendant had touched Mary or not. This "express questioning" is sufficient to classify the questioning of Officer Sanchez as interrogation. *See id.*

dence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona.*" *State v. Bido,* 941 A.2d 822, 835 (R.I.2008) (quoting *State v. Dumas,* 750 A.2d 420, 423 (R.I.2000)). "Judicial inquiry into the propriety of a defendant's waiver, therefore, is two dimensional." *State v. Leuthavone,* 640 A.2d 515, 519 (R.I.1994). "First, the relinquishment of the right must have been voluntary * * *. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). This bipartite inquiry requires an analysis of the "totality of the circumstances surrounding the interrogation." *Id.* (quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

 "The definitive test of the voluntariness of a statement is whether, after taking into consideration the totality of the circumstances, it was the product of the defendant's free will or was instead the result of coercion that overcame the defendant's free will at the time that it was made." *State v. Mlyniec,* 15 A.3d 983, 996 (R.I.2011) (quoting *State v. Perez,* 882 A.2d 574, 589 (R.I.2005)).

In denying defendant's motion to suppress the statements made at the police station, the trial justice found that prior to being interviewed by the detectives, defendant was "very upset," had been crying, and was pale. The trial justice also found, however, that defendant's emotional state was not a product of law enforcement conduct or coercion; rather, she reasoned that it was a result of his mother-in-law "slapping him around." She further found that by the time defendant was questioned by Dets. Podedworny and Pieranunzi, enough time had passed for defendant to "di-

stanc[e] himself from the abuse of his mother-in-law." As a result, the trial justice was "not moved by" any argument that defendant's emotional state in any way negated the voluntariness of defendant's statements to Dets. Podedworny and Pieranunzi at the police station. Thus, the trial justice concluded there was no evidence of police coercion or overreaching and "no evidence that would suggest that [defendant's] statement[s] w[ere] other than given as his own free choice."

 After a careful review of the record, this Court cannot say that these findings are "clearly erroneous." In fact, at the suppression hearing, defendant's own attorney admitted that defendant was not forced to make a statement to police. There, he stated "this isn't the usual suppression motion where defendant comes in and says, you know, I was forced to do this statement, I was abused, I was threatened to do this" and "[defendant] never says he was forced to give the statement." This, buttressed by the undisputed evidence that defendant never was threatened by the officers, never informed the officers that he was confused or felt pressured, never requested that questioning cease, and never requested an attorney, exposes the lack of any evidence suggesting that defendant's statements and waiver of his rights were not of his own free will. "Absent evidence that [defendant's] 'will was overborne and his capacity for self-determination critically impaired' because of coercive police conduct * * * his waiver * * * was voluntary under * * * *Miranda.*" *Leuthavone,* 640 A.2d at 519 (quoting *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). Accordingly, after a conscientious review of the record, considering the totality of the circumstances, and giving due deference to the trial justice's findings of historical fact, we concur with the trial justice's ruling that defen-

dant voluntarily waived his *Miranda* rights.

 Holding that defendant voluntarily waived his *Miranda* rights, however, does not end the inquiry. This Court similarly must be satisfied that defendant's waiver was knowing and intelligent.

"If a suspect has been advised of *Miranda* rights and thereby comprehends that there is a right to counsel and a right to remain silent *and* that any statements made may be used against the suspect in subsequent criminal proceedings, the suspect—for purposes of the Constitution—has been made fully aware of the nature of his or her rights and the possible consequences of abandoning those rights. In such a case any subsequent waiver of those rights would be found to be knowing and intelligent." *Leuthavone*, 640 A.2d at 520.

Evidence that a defendant failed to fully and completely appreciate the consequences of waiving his rights does not "defeat [a] showing that the information * * * provided to him satisfied the constitutional minimum." *Id.* (quoting *Patterson v. Illinois*, 487 U.S. 285, 294, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)). To the contrary, the Supreme Court has repeatedly held that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at 574, 107 S.Ct. 851. Instead, a knowing and intelligent waiver may be executed when a defendant is apprised of the *Miranda* warnings, comprehends such warnings, and thereafter makes a voluntary statement. *Berghuis v. Thompkins,* —— U.S. ——, ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

The trial justice determined that defendant was alert, oriented, and proficient enough in Spanish and English to understand the rights provided to him. She specifically found the chain of events concerning defendant's waiver of his rights to be as follows. The defendant read the Spanish Rights Form aloud to Officer Sanchez, line-by-line, indicated that he understood each of the enumerated rights, and initialed each right, also line-by-line. She found defendant's testimony that he did not understand these rights to be "self-serving" in light of the fact that defendant admitted he understood Spanish and had indicated to Officer Sanchez that he understood each right. After being interviewed in English, with Officer Sanchez present if translation was necessary, defendant wrote a "lucid and articulate" incriminating statement in Spanish. The trial justice ultimately concluded that a "reasonable and prudent person similarly situated certainly would have understood that they were giving up their *Miranda* rights, and the [c]ourt finds that this defendant understood it as well."

Upon a thorough review of the record, this Court perceives no basis for holding that the trial justice's findings of historical fact are clearly erroneous. The defendant maintains that because of his lack of familiarity with the legal system and the English language, he did not knowingly and intelligently waive his rights. Based on this Court's independent application of the trial justice's findings of fact to the issue of whether a valid knowing and intelligent waiver was executed, we conclude that defendant's argument is of no avail.

Although this Court takes into consideration the "particular facts and circumstances surrounding [the] case, including the background, experience, and conduct

of the accused," *State v. Garcia*, 643 A.2d 180, 189 (R.I.1994) (quoting *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)), defendant's lack of previous experience with the criminal justice system is relevant only so far as its "impact on the [defendant's] *ability to comprehend* the *Miranda* warnings." *Leuthavone*, 640 A.2d at 520. There is little to suggest that defendant did not, in fact, comprehend the *Miranda* warnings that were provided to him. To the contrary, defendant's own testimony at the suppression hearing on direct examination indicates he was aware of the consequences of speaking to law enforcement— he knew that his statements could be used against him in court:

"Q [W]hy didn't you tell the officers you didn't understand?

"A I was afraid, really. I was afraid to ask.

"Q What did you think would happen if you asked them a question?

"A That I would say something that would be taken against me."

■ When the circumstances of defendant's statements are viewed as a whole, it is clear to us that defendant's waiver was made knowingly and intelligently. Even if defendant's grasp of the English language is as limited as he testified, it would have little bearing on whether he validly waived his *Miranda* rights because defendant was advised of such rights in his first language of Spanish—a language defendant testified he was proficient reading, writing, and speaking. "Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." *Leuthavone*, 640 A.2d at 520 (quoting *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990)). Applying

this principle and considering the totality of the facts and circumstances surrounding defendant's interrogation, this Court has discerned no evidence to suggest that defendant failed sufficiently to comprehend the nature of his rights or the consequences for abandoning them. We therefore conclude that there is clear and convincing evidence in the record to support a determination that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights and confessed to having sexually assaulted Mary.

**B**

**Motion for Judgment of Acquittal**

■ The defendant next argues on appeal that the trial justice erred in denying his motion for judgment of acquittal on count 1, vaginal/penile penetration. To support this argument, defendant contends that in light of Mary's "unreliable, uncertain, and unsubstantiated testimony" about sexual penetration and the lack of scientific evidence to show such penetration, the prosecution failed to meet its burden of proof beyond a reasonable doubt.

■ "It is well established that the 'denial of a motion for judgment of acquittal made at the close of the state's case is preserved for appeal only if the defense has rested its case * * * or renews the motion at the conclusion of the presentation of all the evidence.'" *State v. Clark*, 974 A.2d 558, 569 (R.I.2009) (quoting *State v. Disla*, 874 A.2d 190, 195 (R.I.2005)). Here, defendant raised his motion for judgment of acquittal only after the state rested its case. The defendant failed to renew this motion upon the presentation of all the evidence. As a result, "any review of the denial of the judgment of acquittal is foreclosed." *Clark*, 974 A.2d at 569 (quot-

ing *State v. Colbert,* 549 A.2d 1021, 1023 (R.I.1988)).[12]

## C

### Motion for a New Trial

 Lastly, defendant argues that the trial justice erred in denying his motion for a new trial because the jury's verdict "failed to do substantial justice" and the trial justice overlooked material evidence related to a critical issue in the case. The defendant asserts that the trial justice overlooked the fact that Mary's testimony "was neither credible nor reliable because she was too intoxicated to recall any specific details and she failed to report her allegations for several days when she had ample opportunity to do so." The defendant contends that Mary's unreliable testimony combined with defendant's "constant and consistent denial of sexual intercourse" and a lack of DNA evidence together prove that defendant is entitled to a new trial.

 "When ruling on a motion for a new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.' " *State v. Vargas,* 21 A.3d 347, 354 (R.I.2011) (quoting *State v. Prout,* 996 A.2d 641, 645 (R.I.2010)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *Prout,* 996 A.2d at 645). The trial justice should deny the motion for a new trial "[i]f 'the trial justice

agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome' * * *." *Prout,* 996 A.2d at 645 (quoting *State v. Cerda,* 957 A.2d 382, 385 (R.I.2008)). If, however, the trial justice disagrees with the jury's verdict, he or she must "embark on a fourth analytical step." *State v. Guerra,* 12 A.3d 759, 765 (R.I.2011). This step requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* at 765–66 (quoting *State v. Rivera,* 839 A.2d 497, 503 (R.I.2003)). "If the verdict meets this standard, then a new trial may be granted." *Id.* at 766.

 "This Court's review of a trial justice's decision on a motion for a new trial is deferential." *Vargas,* 21 A.3d at 354 (quoting *Prout,* 996 A.2d at 645). Accordingly, "[i]f the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Cipriano,* 21 A.3d 408, 429 (R.I.2011).

Upon review of the record, we are satisfied that the trial justice performed the appropriate analysis in deciding defendant's motion for a new trial. She thoughtfully recited the proper standard and meticulously performed an independent assessment of the sufficiency of the evidence and credibility of the witnesses.

The heart of this case is credibility: whether Mary, the complaining witness, or defendant is to be believed. The trial

---

12. Even if this issue had been adequately preserved, it would not profit defendant. We are satisfied, as was the trial justice, that "[b]ased on [Mary's] testimony alone, there is sufficient evidence when viewed in a light most favor-

able to the [s]tate, drawing all reasonable inferences that are consistent with guilt, for a jury to return a verdict of guilty beyond a reasonable doubt on [c]ount 1."

justice resoundingly agreed with the jury's determination that Mary's testimony was more credible than that of defendant's:

"There is no question, and she testified to it, she absolutely never consented to the contact. When it was happening, she wasn't able to resist. She was helpless. She was so drunk. She just felt her body was numb. That was her testimony, and that testimony was credible and reliable. The jury was correct in accepting it."

The trial justice acknowledged that there are "many things [Mary] doesn't remember, but the things she remembered were corroborated by other evidence." This other evidence includes the testimony of Mrs. Jimenez, who was, according to the trial justice, "the most compelling witness," and defendant's own admissions.

In contrast, the trial justice found defendant's testimony devoid of any credibility. "Evidence that she consented was an out and out lie. One more lie by a lying man, a lying, cheating man." The trial justice rejected defendant's argument that the lack of DNA evidence "substantiate[s]" defendant's denial of sexual penetration and, instead, found the lack of such evidence simply the result of defendant "remov[ing] his penis before ejaculating." She further stated that the jury heard evidence showing defendant as a man who "compounded his many lies and his disgusting cheating on his wife" and "[t]hat's the man the jury considered when they determined the credibility of his testimony and rejected it as this [c]ourt rejects it sitting as a [thirteenth] juror."

"The mere fact that defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." *State v. Rivera*, 987 A.2d 887, 903 (R.I.2010). The trial justice had the opportunity to observe the witnesses testify "and therefore is in a better position [than this Court] to weigh the evidence and to pass upon the credibility of the witnesses * * *." *State v. Ferreira*, 21 A.3d 355, 367 (R.I.2011) (quoting *Rivera*, 987 A.2d at 903). Therefore, the trial justice's ruling on the motion for a new trial is entitled to great weight and will not be overturned unless the trial justice clearly erred in her credibility determinations. *Id.* We are satisfied that the trial justice did not clearly err in her credibility determinations. Rather, she independently weighed the evidence and sedulously performed her responsibilities in denying the motion for a new trial.

### III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record of the case shall be remanded to the Superior Court.