**Supreme Court**

No. 2015-335-C.A.
(P1/14-2044A)

State                    :

    v.                   :

Ernest Sabourin.         :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Ernest Sabourin. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The defendant, Ernest Sabourin, appeals from a judgment of conviction after a jury found him guilty on two counts of first-degree sexual assault. The defendant had been accused by a woman, both of whom believed was his daughter,[1] of sexually assaulting her at a time when she was too intoxicated to resist. The trial justice sentenced the defendant to twenty-five years on the first count and twenty-five years on the second count, to run concurrently with the first count. On appeal, the defendant argues that the state has failed to meet its burden of demonstrating, by clear and convincing evidence, that he knowingly, intelligently, and voluntarily waived his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966), and that he thereafter made voluntary statements. After careful consideration of the defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

---

[1] DNA testing later determined that the two were not related.

# I

## Facts and Travel

### The Incident

On the evening of April 5, 2014, the complaining witness left defendant's apartment to attend a party with defendant's grandson. She had already been drinking when she left the apartment. At the party, she consumed more alcohol but she could not recall how many drinks she consumed. By the time she left the party, she was stumbling and, according to her testimony, was "pretty drunk." She was driven back to defendant's apartment. Upon her entry into the apartment, she went straight for the couch.

According to the complaining witness, defendant approached her while she was on the couch and began to remove articles of clothing from her body and touch her everywhere. She kept saying "no" and telling him to "stop." She testified that defendant then dragged her into his bedroom. Once she was on the bed, defendant removed her jeans and her underwear. At this point, she remembered defendant penetrating her with his fingers. She felt his mouth and tongue on her vaginal area. She testified that she wanted it all to stop but because of the alcohol in her system she was unable to move.

The next morning, one of defendant's sons drove the complaining witness to her mother's house. She told her mother what had happened to her the night before. The defendant's son later returned to bring her to the Central Falls police station. The woman gave the police a statement and she was brought to the hospital. The defendant's son also spoke to the police.

**The Visit to Defendant's Apartment**

After speaking to both witnesses, a lead detective, accompanied by another detective, went to defendant's apartment. They were clad in civilian clothing and drove an unmarked police vehicle.[2]

The defendant resided on the second floor of a three-family house. The detectives entered through the unlocked common entryway of the house and walked up the stairs leading to the second floor. When they reached the second floor, they knocked on defendant's door.

When defendant asked who was at the door, the detectives informed him that it was the police. The defendant opened the door and said, "I knew you guys were coming. I don't want to go through this again." One of the detectives testified that she believed that defendant was "basically inviting [them] in" because he opened the door and stood back, and, as the detectives stepped forward, he did not say "stop." In response to defendant's statements, one of the detectives asked him, "What do you mean by that?" The defendant responded, "[the complaining witness] was here last night, she was drunk, she kept taking her clothes off, I had to make her go in my bedroom."

One of the detectives then asked him if he would give them consent to search his apartment. The detective testified that, as he was trying to read the consent-to-search form to him, defendant was continuously talking over him, trying to explain what had occurred the night before. He kept repeating the same story that "[the complaining witness] came to [his] house drunk * * * [and] kept taking her clothes off." Significantly, one of the detectives instructed him not to say anything further. The detectives then testified that neither of them was yelling at

---

[2] A uniformed officer in a marked police vehicle responded to defendant's home with the detectives. She parked behind the detectives but remained outside.

defendant; he was not handcuffed, nor was he told he was under arrest.  The defendant ultimately signed the consent-to-search form.

After signing the form, defendant asked the detectives what they were searching for.  When one of the detectives indicated that they were going to seize the bedsheets, defendant said that they "were not going to like what [they] found on the sheets."  The detective then asked him, "What do you mean?"  The defendant answered that the complaining witness "was in the bedroom and had been playing with herself."

After seizing the bedsheets, the detectives asked defendant if he would accompany them to the police station.  He responded that he would but that he first wanted to comb his hair.  The detectives allowed him to comb his hair in the bathroom; neither of the detectives accompanied him there but the bathroom door remained open.  After all three of them left the apartment, the uniformed police officer, who had remained outside the apartment, took defendant into custody.

Once at the police station, the lead detective asked defendant if he would speak to her, and he agreed.  At this point, defendant was informed of his <u>Miranda</u> rights.[3]  He initialed on the

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").  These safeguards include the following: The defendant

> "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  <u>Id.</u> at 479.

The defendant must be given the "[o]pportunity to exercise these rights * * * throughout the interrogation."  <u>Id.</u>  "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement."  <u>Id.</u>  However, "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."  <u>Id.</u>

form after each of his rights was read to him. Notably, however, defendant checked off "no" for the part that read, "I understand my rights." The detective, however, believed that the "no" was applicable to the statement that came right before that statement and read, "The police have made no threats or promises to me." Nonetheless, she testified that she asked him several times whether he understood his rights; each time he indicated that he did. The defendant subsequently agreed to give a statement.

His statement was typed up by the detective and was reviewed with defendant, both on the computer screen and again after it was printed. After he read each of his responses, he initialed each one to indicate that he read and understood it. In addition to imparting his initials, defendant signed the bottom of the page.

In July 2014, a grand jury indicted defendant on five counts: one count of engaging in sexual penetration, to wit, digital/vaginal penetration, knowing or having reason to know that the victim was physically helpless (count 1), in violation of G.L. 1956 § 11-37-2; one count of engaging in sexual penetration, to wit, cunnilingus, knowing or having reason to know that the victim was physically helpless (count 2), in violation of § 11-37-2; one count of engaging in sexual contact, to wit, mouth to breast, knowing or having reason to know that the victim was physically helpless (count 3), in violation of § 11-37-4; and two counts of assault (counts 4 and 5), in violation of G.L. 1956 § 11-5-3.

**Hearing on Motion to Suppress**

In April 2015, defendant filed a motion to suppress the statements that he had given to the police. At the hearing on the motion, the lead detective testified that, among other things, defendant had been free to move around his apartment and that there had been no handcuffs employed inside the apartment. The other detective testified that they did not read the Miranda

warnings to defendant at any point in time in the apartment because he was not under arrest at that point. He further indicated that they were not there to question defendant about the incident; rather, they were there solely to attempt to obtain a consent to search. He maintained that defendant voluntarily provided information to them.

At the conclusion of the hearing, the hearing justice denied the motion to suppress the statements that had been made by defendant at his apartment. The hearing justice found that there was no evidence that the police forced their way into defendant's apartment. He further determined that there was no evidence that the police had, in any way, indicated to defendant that he was obliged to let them in, that they were not leaving, or that he was under arrest.

In addition, the hearing justice found that there was no evidence in the record that defendant's freedom had been curtailed at any time until he left the apartment and was placed in the police cruiser. He found that there was no evidence in the record that the police ever employed any force or coercion while they were in defendant's presence in the apartment. Rather, he determined that the police had spoken to defendant in a friendly manner.

Furthermore, the hearing justice noted that the police had not acted in any way to place defendant in custody. Employing the standard of a reasonable innocent person in identical circumstances, the hearing justice said that "the mere fact that the police were in [a reasonable innocent person's] apartment would not indicate that they were in custody."

Lastly, the hearing justice concluded that the evidence led to the conclusion that the police asked defendant whether or not he would accompany them to the police station, and he unhesitatingly agreed to do so. After meticulously going through each factor for determining whether defendant was in custody, the hearing justice concluded that defendant was not in custody while the police were in his apartment. He reasoned that, in view of all the

circumstances, there was no evidence that a reasonable person would believe that he or she was not free to leave. Moreover, the hearing justice found that defendant's statements were not invited by the police; rather they were voluntary statements.

With respect to the statements of defendant while he was at the police station, the hearing justice found that there was no evidence of any interaction between defendant and the detectives that would suggest that he was in any way coerced or that he did not understand his rights. The hearing justice determined that there was no testimony that defendant indicated that he did not wish to go forward with the interview at any point, that he wished the assistance of counsel, or that he did not understand his rights.

The hearing justice determined that the only issue with respect to defendant's waiver of his rights was as a result of his checking off "no" on the rights form after the two following statements: "The police have made no threats or promises to me"; and "I understand my rights." The hearing justice found that both detectives were credible when they testified that they understood defendant's "no" to be in response to the statement that the police had made no threats or promises to him. Further, the hearing justice noted that the fact that defendant initialed all the previous five statements on the form indicated that he understood his rights. Additionally, his typed-up statement began with,

> "I, Ernest Sabourin[,] * * * make the following statements after having been advised of my rights. I give up my rights. I do not want a lawyer at this time. I want to talk to the police. I'm doing these things voluntarily and without threats or promises by members of the Central Falls Police Department."

The hearing justice ruled that this opening indicated that defendant further affirmed that he understood his rights. Consequently, the hearing justice found that there was clear and convincing evidence that defendant's waiver was knowing, voluntary, and intelligent.

Before trial, the state dismissed counts 3, 4, and 5 in accordance with Rule 48(a) of the Superior Court Rules of Criminal Procedure. After the trial concluded and after the jury found him guilty on counts 1 and 2, defendant filed a motion for new trial, which was subsequently denied. The trial justice then sentenced defendant to twenty-five years on count 1 and twenty-five years on count 2, to run concurrently with count 1. The defendant timely appealed to this Court.

## II

### Standard of Review

"In reviewing the trial justice's denial of [the] defendant's motion to suppress * * * incriminating * * * [statements], we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." State v. Jimenez, 33 A.3d 724, 732 (R.I. 2011) (quoting State v. Linde, 876 A.2d 1115, 1124 (R.I. 2005)). "A finding of fact is clearly erroneous 'when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" State v. Barros, 24 A.3d 1158, 1179 (R.I. 2011) (quoting State v. LaRosa, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a de novo review * * *." Jimenez, 33 A.3d at 732 (quoting Linde, 876 A.2d at 1124). Accordingly, "whether [the] defendant's statements to police were 'voluntary' [is a] question[] that this Court reviews de novo." Id. (quoting State v. Apalakis, 797 A.2d 440, 443 (R.I. 2002)).

## Analysis

On appeal, defendant argues that his oral statements to the police should have been suppressed because he was in custody while in his home and was subject to interrogation by the police without the benefit of <u>Miranda</u> warnings.  He further argues that his post-<u>Miranda</u> statements were inadmissible because the police employed the "question first" interrogation technique, a practice found unconstitutional by the United States Supreme Court in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).

### Custodial Interrogation

"It is well settled that the requirement of <u>Miranda</u> warnings is triggered only by custodial interrogation."  <u>Jimenez</u>, 33 A.3d at 732 (citing <u>State v. Hobson</u>, 648 A.2d 1369, 1371 (R.I. 1994)).  Therefore, "<u>Miranda</u> does not apply unless the defendant (1) was in custody and (2) was interrogated."  <u>State v. Harrison</u>, 66 A.3d 432, 441 (R.I. 2013) (citing <u>State v. Edwards</u>, 810 A.2d 226, 239 (R.I. 2002)).

A person is in custody "if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave."  <u>Jimenez</u>, 33 A.3d at 732 (quoting <u>State v. Vieira</u>, 913 A.2d 1015, 1020 (R.I. 2007)).  We have previously recognized that

> "the following four factors may be considered in making this determination: '(1) the extent to which the person's freedom [was] curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police.'"  <u>Id.</u> (quoting <u>Vieira</u>, 913 A.2d at 1020).

Furthermore, "the term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980); <u>see also</u> <u>Jimenez</u>, 33 A.3d at 733 n.11.

Assuming without deciding that defendant was in custody, we will focus our analysis on whether defendant was interrogated. "To make that determination we must independently examine the facts, findings[,] and the record of the lower court." <u>State v. Perez</u>, 422 A.2d 913, 915 (R.I. 1980).

In <u>Jimenez</u>, 33 A.3d at 733 n.11, the state did not refute the fact that the defendant was interrogated. The officer had testified that he "kept asking" defendant questions such as "are you sure you didn't do anything, or nothing's going on?" and followed up with such questions as whether defendant had touched the complaining witness or not. <u>Id.</u> This "express questioning" was sufficient to classify the questioning of the officer as interrogation. <u>Id.</u> Similarly, in <u>Harrison</u>, 66 A.3d at 441-42, 442, it was undisputed that the officer interrogated the defendant by posing a question to him, explicitly asking him, "What happened tonight?" Such express questioning is notably absent from the record here.

The defendant's first statement to the detectives, which was that he knew why they were there, was a spontaneous statement, uttered without any questions being addressed to him. In response to defendant's statements, one of the detectives asked him, "What do you mean by that?" to which defendant responded, "[the complaining witness] was here last night, she was drunk, she kept taking her clothes off, I had to make her go in my bedroom." This scenario bears a striking similarity to the fact pattern in <u>State v. Grayhurst</u>, 852 A.2d 491, 513-14 (R.I. 2004), where the detective asked, "[W]hat do you mean?" of the defendant after he blurted out a spontaneous statement. This Court in <u>Grayhurst</u> held that, "[t]aken in context, [the detective's] question 'what do you mean?' did not constitute interrogation." <u>Id.</u> This Court reasoned that

"[t]his question was merely an instinctive reaction, provoked by [the] defendant's initial statement * * *." Id. It is our opinion that the detective's question in this case was also merely an instinctive reaction which was provoked by defendant's uncalled-for and unexpected statement when he opened the door to greet the detectives.

The defendant made other statements while he was in the process of signing the consent-to-search form. The record reveals that, while the detective was attempting to read the form with him, defendant was continuously talking over him, trying to explain what happened. He kept repeating the same story that "[the complaining witness] came to [his] house drunk * * * [and] kept taking her clothes off." Again, it is our opinion that these statements were voluntary and unsolicited by the detectives because there was no questioning of defendant. And "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Innis, 446 U.S. at 299-300 (quoting Miranda, 384 U.S. at 478). Significantly, there was testimony that one detective told defendant that he should not say anything.

After he signed the form, defendant asked the detectives what they were searching for. When one of the detectives indicated that they were going to seize the bedsheets, defendant uttered that they "were not going to like what [they] found on the sheets." This statement also was not invited by the detectives. In response to defendant's unprompted statement, the detective said, "What do you mean?"—to which defendant answered that the complaining witness "was in the bedroom and had been playing with herself." The detective would not have asked this question if defendant had not first provoked him with his statement. Accordingly, we are of the opinion that the detective's question was, again, merely an instinctive reaction to

defendant's voluntary statement; it was by no means an interrogation on the part of the detectives.

The defendant, however, argues that the detective asked him "the age-old 'Who? What? When? Where? and Why?' and in so doing, solicited incriminating responses from [him]." The defendant cites to Innis, to maintain that the detective's words or actions were reasonably likely to elicit an incriminating response from defendant. We discern no merit in this argument. The detective asked the same question on two occasions, both times in response to defendant's voluntary statements. We cannot fathom how defendant perceives five different questions from this one remark. Moreover, it is our opinion that defendant was not subjected by the detective to words or actions that the detective should have known were reasonably likely to elicit an incriminating response from him. As we have elucidated earlier in this opinion, the detective's questions were merely instinctive reactions to defendant's deliberate statements; they were not calculated or "well-timed," as defendant claims, to elicit incriminating responses.[4]

Because defendant was not interrogated, the exclusionary rule of Miranda was not triggered. The hearing justice's finding that defendant's statements were not invited by the police but were voluntary statements was appropriate, and we completely agree with it. For that reason, the hearing justice's denial of defendant's motion to suppress was proper.

### Seibert Issue

The defendant further argues that "the Central Falls detectives violated both the Rhode Island and United States Constitutions by engaging in the two-step questioning practice held to be unconstitutional by the United States Supreme Court in Missouri v. Seibert, 542 U.S. 600 (2004)[,]" because the detectives "neglect[ed] to obtain an arrest warrant when both * * * agreed

---

[4] It has not escaped us that the statements made by defendant while in his apartment were exculpatory in nature.

they possessed probable cause, and [when they] manipulat[ed] the requirements of <u>Miranda</u> in order to obtain incriminating statements from [him] at the Central Falls Police station * * *." The state, however, contends that defendant did not raise this issue below, and, therefore, waived the issue.

Our review of the record before us reveals no indication that defendant raised the issue in the lower court. Consequently, it is our opinion that the issue has been waived. Nevertheless, we will briefly pause to discuss the merits of defendant's claim.

In <u>Seibert</u>, 542 U.S. at 604, the United States Supreme Court reviewed a police protocol for custodial interrogation that called for withholding <u>Miranda</u> warnings until interrogation had produced a confession. The interrogating officer would then impart the <u>Miranda</u> warnings and lead the suspect to cover the same ground a second time. <u>Id.</u> The Supreme Court, in a plurality decision, held that the statement repeated after <u>Miranda</u> warnings were given in such circumstances was inadmissible. <u>Id.</u> In so holding, the Court set forth a number of factors to consider when <u>Miranda</u> warnings delivered midstream could be effective. <u>Id.</u> at 615. The following factors were laid out:

> "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." <u>Id.</u>

However, because we are of the opinion that defendant was not interrogated at his apartment, we need not delve into the factors that were set forth by the Court. <u>Miranda </u>warnings are triggered only when both custody and interrogation are present. <u>See</u> <u>Harrison</u>, 66 A.3d at 441 (citing <u>Edwards</u>, 810 A.2d at 239). Here, because we have held that the interrogation requirement is missing, <u>Miranda</u> warnings were not required. <u>Miranda</u> warnings were necessary

only at the police station, when defendant was in custody and interviewed by the lead detective. Accordingly, it is our opinion that the Central Falls detectives did not engage in the "question first" interrogation technique.

## Voluntary, Knowing, and Intelligent Waiver

The defendant's overarching argument is that his statements to the police should be suppressed because the state failed to meet its burden of proving that those statements were voluntary and made after a knowing and intelligent waiver. Because we have addressed the statements that defendant made at his apartment in detail and have concluded that he was not interrogated, we now focus on the statements that he made while in custody at the Central Falls police station.

When ruling on a motion to suppress a defendant's statements, "the trial justice should 'admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in Miranda v. Arizona.'" Barros, 24 A.3d at 1179 (quoting State v. Bido, 941 A.2d 822, 835 (R.I. 2008)). Therefore, "[j]udicial inquiry into the propriety of a defendant's waiver * * * is two dimensional." Jimenez, 33 A.3d at 734 (quoting State v. Leuthavone, 640 A.2d 515, 519 (R.I. 1994)). "First, the relinquishment of the right must have been voluntary * * *." Id. (quoting Leuthavone, 640 A.2d at 519). "The definitive test of the voluntariness of a statement is whether, after taking into consideration the totality of the circumstances, it was the product of the defendant's free will or was instead the result of coercion that overcame the defendant's free will at the time that it was made." Id. (quoting State v. Mlyniec, 15 A.3d 983, 996 (R.I. 2011)). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision

- 14 -

to abandon it." Id. (quoting Leuthavone, 640 A.2d at 519). "This bipartite inquiry requires an analysis of the 'totality of the circumstances surrounding the interrogation.'" Id. (quoting Leuthavone, 640 A.2d at 519).

In denying defendant's motion to suppress, the hearing justice found that there was no evidence of any interaction between defendant and the detectives that would evidence that he was in any way coerced or that he did not understand his rights. We agree with his determination.

In his statement to the police, defendant said that he carried the complaining witness to his bedroom because she kept falling off the couch. He recounted that he heard her fall off the bed and when he went to his bedroom to pick her up, she had taken all her clothes off. He further detailed that she was the one who "grabbed [his] hand and put [his] right midd[le] finger in her vagina" and "forced [his] head down * * * toward her vagina" and "made [him] kiss that area." On several occasions in his written statement, defendant admitted that he was "scared"; he apologized for what had occurred and vowed that it would never happen again.

After a careful review of the record, we cannot say that the trial justice's findings are clearly erroneous. The defendant's statements at the police station were the product of his free will. The detective began her interview of defendant only after asking him if he would speak to her, which he agreed to do. Accordingly, considering the totality of the circumstances, we concur with the hearing justice's ruling that defendant voluntarily waived his Miranda rights.

Furthermore, we are satisfied that the defendant's waiver was knowing and intelligent. The detective read his Miranda rights to him from a rights form; he initialed the form after each right was read to him. It is noteworthy, however, that the defendant checked off "no" on the rights form after the two following statements: "The police have made no threats or promises to

- 15 -

me"; and "I understand my rights." The hearing justice found that both detectives indicated that they understood the defendant's "no" to be in response to the statement that the police had made no threats or promises to him. The hearing justice concluded that he had confidence in the credibility of the detectives. Even after reading his rights to him, the detective asked the defendant several times whether he understood his rights and each time he indicated that he did. Additionally, the opening of the defendant's typed statement, which he initialed and signed, indicated that the defendant did understand his rights. After considering the totality of the circumstances, we conclude that the record is devoid of evidence that would suggest that the defendant failed to comprehend the nature of his rights or the consequences of abandoning them.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to that court.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Ernest Sabourin. |
| **Case Number** | No. 2015-335-C.A. (P1/14-2044A) |
| **Date Opinion Filed** | June 9, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Luis M. Matos |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General<br><br>For Defendant:<br><br>Lara E. Montecalvo<br>Office of the Public Defender |