April 16, 2018

**Supreme Court**

No. 2016-40-C.A.
(P1/13-2349A)

State                             :

v.                             :

Marc Gouin.                             :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                      :

v.                                       :

Marc Gouin.                                :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  The state appeals a Providence County Superior Court justice's decision granting a motion to suppress brought by the defendant, Marc Gouin (Gouin or defendant).  The defendant was indicted by a grand jury on four counts of child molestation. Prior to trial, he moved to suppress statements he made to a Massachusetts Department of Children and Families (DCF) investigator on grounds that he had rendered the statements involuntarily.  The hearing justice granted his motion, and the state appealed as allowed by G.L. 1956 § 9-24-32.  For the reasons set forth herein, we vacate the decision of the Superior Court.

**I**

**Facts and Travel**

In August 2013, a grand jury indicted defendant on two counts of first-degree child molestation sexual assault and two counts of second-degree child molestation sexual assault, in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.3.  The complaining witness, defendant's niece Emma,[1] alleged that in 2005 defendant had sexually abused her.  On December 7, 2015, in advance of trial, defendant moved to suppress statements that he made to Kristin Prescott, a DCF

---

[1] The complaining witness's name has been changed to protect her anonymity.

investigator, during a July 11, 2012 interview at his home.[2]  The hearing justice conducted an evidentiary hearing on the motion on January 19, 2016.

A

**Accusations Against Defendant**

At the motion to suppress hearing, Prescott testified for the state.  Prescott had worked for DCF at its office in Taunton, Massachusetts, as an investigator for eighteen years.  In that role, she probed abuse and neglect allegations to ascertain their veracity.  In 2012, she began investigating defendant.

Prescott testified that DCF had received a report from a mandated reporter[3] stating that Emma revealed during a July 9, 2012 SAIN interview[4] that she had been sexually abused by defendant, as well as by her father.  According to Prescott, Emma told the mandated reporter specifically that defendant "had touched her in her vaginal area under her underwear," that he had "'put his thing in her mouth' on more than one occasion," and that "he would touch himself while he was touching her, things of that nature."

The defendant also had a stepdaughter, Marie.[5]  During the SAIN interview, Emma indicated that Marie's daughter, Olivia,[6] lived with defendant, and Emma was concerned for Olivia's safety.[7]

---

[2] The defendant also filed a motion *in limine*, arguing that his statements were inadmissible pursuant to the Rhode Island Rules of Evidence.

[3] A mandated reporter is a person who has a statutory duty to report any evidence of criminal activity to the police.  Mass. Gen. Laws Ann. ch. 119, § 51A.

[4] According to Prescott, a SAIN interview is a recorded interview conducted by a forensic interviewer after allegations of sexual abuse.

[5] This name has also been changed in the interest of anonymity.

[6] This name has also been changed in the interest of anonymity.

[7] Emma alleges that these incidents occurred in 2005.  They were originally reported to law enforcement at that time, along with similar allegations made by Marie.  However, the 2005 criminal investigation was suspended; the papers presented in this appeal do not elucidate why.

Emma's interview resulted in the preparation of a report[8] implicating defendant, and imposed an obligation on DCF to investigate her accusations. Prescott alerted law enforcement to Emma's allegations against defendant and her father; and, on July 10, 2012, Prescott made an unannounced visit to defendant's Seekonk, Massachusetts home. The defendant was not home, and Prescott scheduled a visit with him through Michelle Gouin—defendant's wife—for July 11, the following day.[9] Prescott testified that, during that July 10 conversation, when she informed Michelle of Emma's claims, Michelle became upset and "told [her] this [was] something that happened a long time ago * * *."

Prior to the July 11 interview, Prescott contacted the East Providence and Seekonk police departments to obtain the 2005 records of the accusations against defendant. She received East Providence police reports regarding defendant the morning of the interview and attempted to contact a detective there, but was unsuccessful. Prescott testified that neither the East Providence nor the Seekonk police instructed her to speak with defendant.

**B**

**Interview with Defendant**

On July 11, 2012, Prescott went to defendant's home for the scheduled visit. The purpose of the visit, she testified, was to assess Olivia's safety in the home. Once there, Prescott spoke with Marie before speaking with defendant and Michelle. Prescott characterized defendant and Michelle as intelligent people without any apparent cognitive delays. Prescott spoke with defendant and Michelle while seated at defendant's kitchen table.

---

[8] This report is referred to as a "51A report," which is "[a] report of suspected child abuse filed with the Department of Children and Families in accordance with G.L.c. 119, § 51A * * *." *Commonwealth v. Monroe*, 35 N.E.3d 677, 683 n.8 (Mass. 2015).

[9] Her name is inconsistently spelled both "Michele" and "Michelle" throughout the record. We use the latter spelling, as that is how it appears in the DCF records.

Prescott testified that she gave defendant and Michelle a summation of Emma's SAIN interview and told them of her intent to evaluate Olivia's safety.[10] The defendant told Prescott that "he was in a really difficult situation having to discuss these things again and this was something that had happened a long time ago." He continued that he "had spent so many years trying to get his family back and * * * he had been forgiven by [Emma] and been forgiven by [Marie] * * *." The defendant brought up his brother—Emma's father—and represented that he was "upset that his brother had been mad at him for what he had done when [his brother] was doing the same thing this whole time." He also told Prescott that he "had spent the next six months [after the allegations] trying to kill himself * * *." Prescott described defendant as "emotional and clearly upset * * * [but] polite and cooperative. He was never angry. * * * [A]t the beginning he was a little defensive and upset that [Prescott] was there and the reason that [Prescott] was there, but that changed and [defendant and Prescott] had a conversation * * *."

Prescott reiterated that "the conversation was difficult" and that it was emotional, highlighting that defendant "recognized the concerns around the conversation * * *." Prescott testified that neither defendant nor Michelle asked her to stop the interview, leave their home, or wait until they contacted an attorney. She could not recall if defendant or Michelle asked for an attorney, nor could she recall if she told them that they had the right to stop the interview at any time or ask her to leave.[11] In addition, she stated that, despite knowing the nature of her visit, neither defendant nor Michelle engaged an attorney to be present. While Prescott did not reveal her status as a mandatory reporter to defendant, she testified that no DCF policy required as

---

[10] At this time, Michelle had guardianship of Olivia, although it is unclear whether defendant also was her guardian.

[11] Prescott indicated that, in her experience, if an alleged suspect being interviewed requests an attorney, "that's usually the end of the conversation. People usually stop speaking, people also obtain attorneys prior to home visits[,] * * * [and defendant] did obtain an attorney after my home visit * * *[.]"

much.  Prescott also insisted that she never spoke about Olivia's potential removal from the home and, in fact, there was no cause to remove her at that point.[12]

On cross-examination, Prescott said that—at some point during the interview—she handed defendant and Michelle a brochure entitled "A Family's Guide to Protective Services for Children."  The brochure discussed the purpose of a DCF investigation and was typically given to every family involved with DCF.  It advised that a parent involved with DCF has "the right to speak with an attorney or have one with [him or her] at any time. * * * If DCF takes the case to court and [he or she is not] able to pay for an attorney, the Judge will appoint one for [him or her]."  Prescott indicated, however, that DCF investigators were not required to inform interviewees of these rights at the start of the interview.  The brochure also explained that if a DCF investigator received evidence of abuse, then the investigator was required to give that evidence to law enforcement.  Prescott also testified that she provided defendant with a letter informing him that allegations had been levied against him.  However, Prescott could not recall precisely when during the interview she gave defendant that letter.

Michelle testified for the defense.  She stated that Prescott's interview lasted between an hour and an hour and a half and that Prescott gave defendant and Michelle the letter and the brochure as she was leaving their home.  Michelle also conveyed that, during the interview, she and defendant asked Prescott if they should get an attorney, to which Prescott responded that "there was no time, that she could take [Olivia] that day, and she kept on picking up her cell phone.  She said, 'All I have to do is make a phone call.'"

---

[12] After Prescott concluded her investigation, she allowed Olivia to stay in the home provided that defendant left the premises; however, Olivia was removed after it was discovered that defendant visited the home.  Prescott testified that, when Olivia was eventually removed from the home, "it was much later[,] * * * far after [her] investigation."  When she testified at the hearing, Michelle confirmed that Olivia was removed approximately nine months after the interview.

# C

## Hearing Justice's Decision

In his argument to the hearing justice, defendant conceded that *Miranda*[13] protections did not apply because he was not in custody during the interview. The defendant argued, however, that the state had not met its burden of proving the voluntariness of the statements. Based on the totality of the circumstances, defense counsel argued that Prescott's failure to advise defendant of his rights rendered the statements involuntary. In response, the state asserted that Prescott was not acting at the direction of the police when she spoke with defendant; rather, her sole purpose was to check on Olivia's well-being. Alternatively, the state argued that defendant had made the statements voluntarily.

In a bench decision on January 20, 2016, the hearing justice granted defendant's motion to suppress. He concluded that, while Prescott was not a law-enforcement official, she was "clearly an agent of the government * * *." In support of that holding, he focused on the fact that she worked with the police on child-abuse complaints and was a mandated reporter. On the issue of the voluntariness of defendant's statements, the hearing justice found that the DCF brochure, which stated that defendant had the right to counsel at any time, was delivered after the interview was over. He found Prescott "evasive" in her testimony that she was unaware that the brochure contained information about defendant's right to counsel. The totality of these facts, he concluded, reflected either "sloppy investigative techniques" or "establish[ed] an inference of deception on the part of the government regarding defendant's rights. Either way it diminishes the [s]tate's quantum of proof that has been presented." He did note, however, that he did not

---

[13] *Miranda v. Arizona*, 384 U.S. 436 (1966).

find Michelle credible in her testimony that Prescott notified defendant and Michelle that there was no time to get an attorney and that Olivia could be taken away with one phone call.

Based on these findings, the hearing justice determined "that the [s]tate failed to prove, by clear and convincing evidence, that the defendant knowingly and voluntarily waived his Fifth Amendment rights in this case."[14] It is from this decision that the state appeals.

## II

### Standard of Review

When we review a trial justice's decision granting or denying a motion to suppress, "we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." *State v. Sabourin*, 161 A.3d 1132, 1138 (R.I. 2017) (quoting *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011)). However, when reviewing constitutional issues, such as voluntariness, this Court conducts a *de novo* review. *Id.* at 1139.

## III

### Discussion

We begin by accepting defendant's concession that he was not in custody at the time of the interview. As such, defendant is foreclosed from arguing that his statements were taken in violation of his *Miranda* rights. Moreover, defendant does not contend that his right to counsel had attached at the time of the interview. His sole remaining argument is that his statements were involuntary, in violation of the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and article 1, section 10 of the Rhode Island Constitution.

In deferring to the hearing justice's factual findings, we review them for clear error. *See Sabourin*, 161 A.3d at 1138. The hearing justice "had an opportunity to see the witnesses and

---

[14] Based on his decision, the hearing justice ruled that defendant's motion *in limine* had been rendered moot.

observe their demeanor as they testified, and therefore had the advantage, which we do not have, of determining where the truth lay." *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I. 1998) (quoting *Migliaccio v. A. & S. Angolano, Inc.*, 87 R.I. 194, 203, 139 A.2d 383, 388 (1958)). Based on our comprehensive review of the cold record before us, we cannot say that his findings were clearly erroneous, and we thus accept them and continue to our *de novo* analysis. *See id.*; *see also Sabourin*, 161 A.3d at 1138.

Before evaluating the voluntariness of defendant's statements, we first must determine whether Prescott was an agent of the police during the interview. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986). We have previously considered whether a state protective agency investigator acted as an agent of the police. In *State v. Oliveira*, 961 A.2d 299 (R.I. 2008), we held that a Department of Children, Youth, and Families (DCYF) investigator was a state actor for purposes of the Sixth Amendment. *Oliveira*, 961 A.2d at 307, 311. We recognized that, while she "did not interview [the] defendant at the direct behest of the police or prosecution, she had met and exchanged information with them on the previous day * * *." *Id.* at 310. We emphasized that "she was statutorily required to forward any information she * * * obtain[ed] from [the] defendant concerning child abuse to the police." *Id.* We further noted that the investigator's "role as a child protective investigator was not primarily prosecutorial; rather it was to protect children who might have been at risk due to [the] defendant's suspected abuse." *Id.* at 310-11. Nevertheless, we concluded that she was a state actor because "[i]t [was] clear to us * * * that [she] deliberately intended to elicit incriminating evidence from [the] defendant, which she knew she would then be required to turn over to the police * * *." *Id.* at 311.

While the analysis in *Oliveira* concentrated on a claimed Sixth Amendment violation, we believe that the rationale for holding that a DCYF investigator was a state actor translates to this

case. *Oliveira*, 961 A.2d at 310. Like the investigator in *Oliveira*, here Prescott communicated with the police about defendant and was statutorily obligated to report any incriminating information to them. *See id.* The fact that she interviewed defendant for reasons other than prosecutorial purposes does not convince us now, as it did not convince us in *Oliveira*, that she was not acting as an agent of the police. *See id.* at 310-11. Accordingly, we hold that Prescott acted as a police agent during the interview.

We can now address the voluntariness of defendant's statements.[15] "A defendant's statement is voluntary when it is the product of his free and rational choice." *State v. Bojang*, 138 A.3d 171, 180 (R.I. 2016) (quoting *State v. Bido*, 941 A.2d 822, 836 (R.I. 2008)). In contrast, an involuntary statement is one "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Id.* (quoting *Bido*, 941 A.2d at 836). When a defendant alleges that his statements were coerced, we require the state to "prove voluntariness by clear and convincing evidence." *State v. Amado*, 424 A.2d 1057, 1061 (R.I. 1981). "In deciding whether a statement is voluntary, this Court considers the totality of the circumstances surrounding the challenged statement." *Bojang*, 138 A.3d at 180 (quoting *Bido*, 941 A.2d at 836). The relevant considerations "are the background, experience and conduct of the accused, as well as the level of a suspect's educational attainments." *Id.* at 181 (quoting *Bido*, 941 A.2d at 836).

The gravamen of defendant's argument is that Prescott's failure to tell defendant at the start of the interview that she was a mandatory reporter and her failure to give him the DCF brochure informing him of his right to counsel "created confusion and resulted in a statement

---

[15] While the state asserts that the hearing justice applied the incorrect standard in analyzing defendant's statements, we need not decide whether that is so because our review is conducted *de novo*.

that can only be described as coerced." However, the hearing justice's factual findings illustrate that Prescott and defendant engaged in a dialogue that defendant never sought to cease.

The "conversation," as Prescott described it, does not reflect a coercive confabulation. Prescott remembered defendant as mostly polite and cooperative during the interview; at worst, she described him as "a little defensive" and emotional. *See Bido*, 941 A.2d at 836 (holding that there was no evidence of coercion or intimidation where the defendant appeared "calm" and "spoke spontaneously"). She further described defendant as intelligent, thus evidencing that he "had the capacity and knowledge to understand what he was doing[.]" *State v. Marini*, 638 A.2d 507, 513 (R.I. 1994); *see also State v. Ramsey*, 844 A.2d 715, 720 (R.I. 2004) (concluding that "[t]he defendant also had held positions of employment and responsibility that required intelligence and competence; he therefore had the intelligence to make the statement a voluntary product"). Moreover, Prescott's July 11 interview with defendant was scheduled in advance, giving him an opportunity to cancel it or obtain counsel. And yet, defendant willingly met with her without counsel. *See Jimenez*, 33 A.3d at 734 (determining that the defendant made statements voluntarily where the "defendant's own attorney admitted that [the] defendant was not forced to make a statement to police").

It is also significant that the hearing justice found Michelle's testimony that Prescott said Olivia could be removed with one phone call incredible. That testimony is the only evidence that even remotely suggests coercive tactics. Because the hearing justice determined that it was unreliable, we discern no viable basis for defendant's claim of coercion. It is undisputed that defendant never told Prescott that he was confused or asked Prescott to leave; nor is there any credible evidence that Prescott threatened him. *See Jimenez*, 33 A.3d at 734. This "exposes the lack of any evidence suggesting that defendant's statements * * * were not of his own free will."

*Id.* In fact, Prescott's interview at defendant's kitchen table is the antithesis of a coercive interrogation likely to cause a suspect to make an involuntary statement. *See State v. Hall*, 940 A.2d 645, 657 (R.I. 2008) (holding that the defendant's statement to police was voluntary where "although [he] had one arm in a handcuff affixed to the wall, there [was] nothing in the record to suggest that he even was uncomfortable").

The defendant relies heavily on the fact that Prescott gave him the brochure at the end of the interview, contending that Prescott's untimely delivery of the brochure prevented him from being adequately informed of his rights. We disagree. Because defendant conceded that he was not in custody, his Fifth Amendment right to counsel had not attached; and, because he had not been charged with a crime, neither had his Sixth Amendment right to counsel.[16] It is axiomatic that "[o]nce the right to counsel has attached and been asserted, the [s]tate must of course honor it." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). But if the right to counsel has not attached, then there is nothing for the state to honor. *See id.*; *cf. Oliveira*, 961 A.2d at 310-11 (holding that the DCYF investigator obtained statements from the defendant while he was incarcerated in violation of his Sixth Amendment right, where the defendant had been charged and was in custody). No DCF policy required Prescott to give defendant the brochure at the beginning of the interview. While Prescott could have done so, it does not follow that it was unconstitutional for her to have waited.

In conclusion, we hold that the defendant's statements were voluntary and that the motion to suppress should have been denied.

---

[16] While defendant initially argued to the hearing justice in support of his motion to suppress that he had a right to counsel based on the 2005 criminal charges against him, defendant did not pursue that argument at the hearing on the motion to suppress, and thus it is not before us now.

**IV**

**Conclusion**

For the foregoing reasons, we vacate the decision of the Superior Court. The record shall be remanded to that tribunal for further proceedings consistent with this opinion.[17]

---

[17] Based on our holding, defendant's motion *in limine* must be readdressed on remand.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Marc Gouin. |
| **Case Number** | No. 2016-40-C.A. (P1/13-2349A) |
| **Date Opinion Filed** | April 16, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian Van Couyghen |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General <br><br> For Defendant: <br><br> Melissa Larsen, Esq. <br> Edward C. Roy, Jr., Esq. <br> James E. O'Neil, Esq. |